EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
United States Department of Justice
RITESH SRIVASTAVA (Cal. Bar No. 246477)
CLAIRE YAN (Cal. Bar No. 268521)
Trial Attorneys
Fraud Section, Criminal Division
United States Department of Justice
    4811 Airport Plaza Drive, 5th floor
    Long Beach, California 90815
    Telephone: (202) 341-4193
    E-mail:   Ritesh.Srivastava@usdoj.gov
              Claire.Yan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-00666-SJO-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT VALERY BOGOMOLNY |
| v. | |
| VALERY BOGOMOLNY, | DATE:    October 7, 2016 |
| Defendant. | TIME:    9:00AM |
| | JUDGE:   Hon. S. James Otero |

    Plaintiff United States of America, by and through its counsel of record, the Fraud Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the Central District of California (together, the "government"), submits this Sentencing Memorandum regarding Defendant Valery Bogomolny.

    The government's Sentencing Memorandum is based on the attached Memorandum of Points and Authorities; the declaration of Special Agent Rochelle Wong, and the exhibit thereto; all records and files

in the case; and any argument that the Court will hear at the sentencing hearing.

Dated: September 23, 2016		Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


          /s/
RITESH SRIVASTAVA
CLAIRE YAN
Fraud Section, Criminal Division
U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Defendant Valery Bogomolny was the owner and operator of Royal Medical Supply ("Royal"), a durable medical equipment ("DME") supply company.  The business was permeated with fraud.  More than a thousand beneficiaries lived over a hundred miles away from Royal.  Beneficiaries were recruited by "patient marketers."  They were taken to doctors who were not their primary care physicians.  Prescriptions were written for DME by doctors who had either been indicted, associated with fraud, or had their identities stolen.  The top seven doctors alone, several of whom either had their identities stolen or were associated with fraudulent prescriptions, accounted for seventy percent of Royal's business, while one hundred and sixty doctors accounted for the other thirty percent of the business.  Beneficiaries did not need the DME they received and in many cases they did not receive the equipment at all.  The defendant billed Medicare for everything, regardless.  Royal billed over $4 million to Medicare over nearly 4 years and was paid $2.7 million by Medicare.

Based on all the evidence, the jury convicted defendant on November 6, 2015, of all six counts of a six count indictment for health care fraud, in violation of 18 U.S.C. § 1347.

The government differs in certain aspects with the Presentence Investigation Report ("PSR") submitted by the United States Probation Office ("USPO").  For the reasons set forth below, the government respectfully submits that this Court should find that the defendant has a total offense level of 29, corresponding to an advisory range under the United States Sentencing Guidelines ("Guidelines" or "USSG") of 87 to 108 months imprisonment.  Considering the Guidelines

range along with the factors set forth in 18 U.S.C. ¶3553(a), the government recommends that the Court sentence defendant to 87 months in prison followed by three years of supervised release.  The government also recommends, in agreement with the PSR, that the Court order defendant to make $1,266,860.03 in restitution payments to the Medicare program, the victim of defendant's offense.

**II.   OFFENSE CONDUCT**

Defendant, as the owner and operator of Royal, submitted applications to Medicare in order to receive a provider number.  He generally executed all of Royal's corporate documents, opened and operated the bank accounts, and communicated with Medicare on behalf of Royal.  Royal generally billed Medicare for power wheelchairs, back braces and knee braces.  Through Royal, defendant billed Medicare for DME that defendant knew was not medically necessary and that in some cases was not delivered at all.

Several beneficiaries testified at trial.  Nearly all of them had been recruited by patient marketers who convinced beneficiaries one way or another to go to clinics with them.  None of them were taken to their primary care physician and none of them needed the equipment.  Some beneficiaries confirmed that the power wheelchair they received had never been used, sitting unwrapped in a corner, while others stated they did not even receive the equipment that had been billed by Royal.  One beneficiary who testified, C.M., was never even taken to a clinic.  Some individuals had taken C.M.'s Social Security card and did not return it until four days later.

Agents testified that there were numerous beneficiaries that lived far distances away from Royal, which is located in Los Angeles.

Approximately one hundred and thirty beneficiaries that Royal billed for lived in the Fresno area.  Numerous other beneficiaries lived south of San Diego.  Evidence at trial showed that this was a red flag to have beneficiaries located so far away from the DME company, when there are over 7,000 DME companies in California, and there being no reason beneficiaries could not go to a company in their local area.  Also, agents testified that at least eight beneficiaries were interviewed in Fresno who had been billed by Royal for knee braces or back braces and all eight beneficiaries had not received the back or knee brace.

Agents also testified that they interviewed the defendant.  The defendant told agents that he was the sole owner of Royal and that no family members worked with him, and that he was the one who made all the decisions.  SA Li testified that defendant denied supplying DME to the Fresno area.  And more importantly, he stated that he did not sell power wheelchairs and only did so on rare instances, despite the claims data very clearly showing that a significant portion of the business was billing for power wheelchairs.  SA Li also stated that defendant confirmed his signatures on certain documents, including on one delivery ticket purporting to deliver a knee and back brace in the Fresno area (GX[1] 18 at 7).

At trial, defendant testified on his behalf and denied that he said certain things to agents or otherwise disclaimed any knowledge or participation in wrong doing.  The jury did not believe him and returned a guilty verdict on all counts.

---

[1] "GX" refers to Government Exhibit submitted at trial.

3

**III. GUIDELINES CALCULATIONS**

    **A.    Presentence Investigation Report**

On August 9, 2016, the USPO filed its PSR for defendant. (CR 116). In the PSR, the Guidelines range, pursuant to the November 2008 Guidelines Manual, was calculated as follows:

| | | | |
|---|---|---|---|
| Base Offense Level | : | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Loss Amount (more than $1 million) | : | 16 | [U.S.S.G. § 2B1.1(b)(1)] |
| Abuse of Trust | : | 2 | [U.S.S.G. § 3B1.3] |
| Total | : | 24 | |

Based on the PSR's finding of a Criminal History Category I, the Guidelines range, as found by the PSR, on the health care fraud counts (Counts One through Six) is 51-63 months.[2] The PSR found that the intended loss was $1,266,860.63, based on prescriptions from certain doctors being associated with fraud and certain doctors having their identities being stolen. The PSR also noted that "the amount received, not the amount billed, is intended loss." (CR 116 at ¶22-23). The PSR recommended restitution in the amount of $1,266,860.03. (CR 116 at ¶74).

The government disagrees with the PSR's guidelines calculations in three different aspects. First, the government's position is that the billed amount, not the amount received by defendant, is the intended loss in this case.[3] Second, a 3-level increase for

---

[2] Each of the six health care fraud counts carries a 10-year statutory maximum sentence.

[3] The government notes that the billed amount and paid amount, based upon the PSR's basis of establishing loss through fraudulent

4

Aggravating Role pursuant to U.S.S.G. §3B1.1(b) should apply. Third, a 2-level increase for Obstruction of Justice pursuant to U.S.S.G. §3C1.1 should apply.

### B. Loss Amount

Evidence at trial showed, among other things, that none of the beneficiaries needed or wanted the equipment; many of the beneficiaries' signatures were forged; they were "recruited" by "marketers;" and fake documents were created purporting to show that home assessments were done, when in fact they were not. Defendant Bogomolny signed or initialed many of these documents and then at trial he denied that he did so. Even putting aside the significant evidence that the entire business was permeated by fraud, it was clearly established at trial, that at a minimum, Royal received fraudulent prescriptions associated with at least six referring physicians: Dr. J.C.W., Dr. S.O.S, Dr. H.D.E, Dr. J.W.E., Dr. P.C.S., and Dr. R.A.G.

Government Exhibit 33, admitted at trial, shows that three doctors, Drs. J.C.W., S.O.S., and H.D.E had "Auto-Deny Edits" ("ADE") set up for them by Medicare. (*See* GX 33). The Medicare witness at trial testified that these types of Auto-Deny Edits are generally put in place when a doctor's NPI number is noted as "compromised" or associated with fraud in some way, or if a doctor signs an attestation that his or her identity has been stolen. Consequently, particular claims that are submitted which are associated with these "compromised" doctors are then automatically denied. Government

---

prescriptions from six referring providers (as discussed below), both amount to over $1,000,000 and less than $2,500,000, and therefore, it does not affect the enhancement for loss amount under U.S.S.G. §2B1.1.

5

Exhibit 33, notes, for example, "STOLENNPI" with respect to Dr. J.C.W. and Dr. H.D.E. (*See* GX 33 at pp. 1, 3).

As to Dr. S.O.S., in addition to the ADE set up for him, his widow testified at trial that prescriptions at Royal which purported to show Dr. S.O.S's signature, i.e., GX 31 admitted at trial, did not actually contain Dr. S.O.S.'s signature. She also testified that her late husband's identity had been stolen.

As to Dr. H.D.E., in addition to the ADE set up for him, evidence at trial also included a prescription in his name for DME to a beneficiary named C.M. (*See* GX 15 at pp. 9-10). C.M. testified at trial that he never visited a clinic where anyone named Dr. H.D.E. may have been working; he had no idea who Dr. H.D.E. was; and he never received any of the DME prescribed by Dr. H.D.E. He also testified that certain individuals had taken his driver license and Social Security card and they did not return his driver's license for about four days.

As to Dr. J.W.E., evidence at trial included a prescription in his name for a power wheelchair to a beneficiary named N.C. (*See* GX 37 at pp. 5-6). Dr. J.W.E. was associated with numerous prescriptions in the Fresno area, which was over two-hundred miles away from Royal Medical Supply. N.C. testified at trial that she did not need, want or request a power wheelchair. She also testified that she had been recruited by "patient marketers" and had been taken to multiple clinics in order to generate prescriptions.

As to Dr. P.C.S., evidence at trial showed that prescriptions for equipment were signed in his name for beneficiaries, including A.C., M.R., and M.H. who all testified that they did not need, want

6

or request the particular equipment. (*See* GX 36 at p. 5; GX 19 at p. 7; GX 35 at p. 13).

As to Dr. R.A.G., testimony at trial indicated that he had been charged with health care fraud and associated with marketers who brought beneficiaries to his clinic. In addition, evidence at trial showed that beneficiary S.G. received medically unnecessary equipment based on a prescription signed in Dr. R.A.G.'s name. (*See* GX 34 at p. 4). S.G. testified that she cooks, cleans and does all her housework.

The total billed based on prescriptions associated with these six referring providers was $1,822,130.50. (*See* Declaration of SA Rochelle Wong at ¶4; GX 13). The corresponding total amount paid by Medicare was $1,266,860.03. (Decl. of SA Wong at ¶4; CR 116 at ¶23). The government submits that this methodology presents a reasonable estimate of the loss amount, based on fraudulent prescriptions associated with the six referring providers noted above. The intended loss is $1,822,130.50, and as the higher of intended or actual loss, it is the loss amount that should be used. However, given that both the billed and paid amount per this loss calculation exceed $1 million, a 16-point enhancement would apply with respect to either amount based on this loss calculation.[4]

---

[4] Though it does not ultimately make a difference under this particular method of calculating loss, the government submits that the amount <u>billed</u> is the intended loss while actual loss is, at a minimum, the amount <u>paid</u> by Medicare. In this case, the higher of these two numbers, the amount billed, $1,822,130.50, is the intended loss, and accordingly, this amount should be the amount that is used as the loss amount (loss is the "greater of actual loss or intended loss" as noted in application note 3 of the November 2008 sentencing guidelines). U.S.S.G. § 2B1.1, App. Note 3(A). The PSR essentially equates intended loss and actual loss as one and the same; that

7

1    As another reasonable and reliable source of establishing loss
2 and demonstrating that the entire business was permeated by fraud, an
3 audit by the Centers for Medicare and Medicaid Services ("CMS") notes
4 that there was an approximate loss amount of $802,299 (an
5 extrapolation based on the denial of 61 out of 61 claims reviewed)
6 over <u>just a one year period</u> between September 2006 and August 2007.
7 (*See* Decl. of SA Rochelle Wong, Ex. 1).  This amounts to
8 approximately $66,858 of loss per month.  Taking that amount over the
9 46 month scheme period in this case (January 2006 through October
10 2009) results in a loss amount of $3,075,468.  This loss amount would
11 result in an 18-point enhancement.  Although the government submits
12 this is also a reasonable estimate of loss, the government, at this
13 time, and in this particular case, does not object to the PSR's
14 method of establishing loss pursuant to fraudulent prescriptions
15 associated with the six referring physicians as discussed above.

16   **C.   Aggravating Role Enhancement**

17    There was ample evidence at trial that clearly showed that the
18 defendant acted as a "manager or supervisor" as defined in §3B1.1 and
19 that based on the number of participants, as well as the extent of
20 the criminal activity, a 3-level enhancement should apply.

21    Section 3B1.1(b) states that the offense level shall increase by
22 3 levels if the defendant was a "manager or supervisor" and the
23 "criminal activity involved five or more participants or was

---

amount being the amount paid by Medicare.  The government respectfully disagrees with that position and submits that intended loss is something more; something different than actual loss.  The government also respectfully disagrees with the statement in the PSR that defendant "would have known that the entirety of his billed amounts would not be reimbursed."  (CR 116 at ¶22).  There was no evidence presented at trial to support such a finding.

8

otherwise extensive." The application note of the Sentencing Guidelines states that in "assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, Application Note 3.

    The defendant was the owner and operator of Royal Medical Supply, and as such, he was the head of the business and the manager. There were also more than five participants involved. There were, for example, two individuals identified by beneficiary witness N.C. who recruited her; there was referring physician Dr. R.A.G. who issued prescriptions that were filled by Royal and who was indicted; and there was also Dr. J.W.E. and his associate A.S. who together were generating prescriptions in the Fresno area.

    In addition, the criminal activity was "extensive" because it involved the participation of numerous people. For example, the defendant testified that he employed I.S. (who testified), and he also employed N.B. who handled management services for Royal. There was also R.G., who made certain deliveries for defendant. Also, there were at least six beneficiaries who testified at trial that stated that they were recruited by different individuals, including beneficiary C.M. who said "people" took his driver license and Social Security card.

    In sum, the entire scheme from start to finish required several doctors, patient-recruiters, and office staff. Six doctors alone were associated with fraudulent prescriptions or theft of their

identity.  For the defendant's plan to be successful, it even required the use of numerous beneficiaries who unwittingly became involved.  A thousand beneficiaries alone lived more than a hundred miles away from Royal.

Therefore, based on the evidence presented at trial, the defendant should be given a 3-level enhancement as the manager or supervisor in a fraudulent scheme with more than five criminal participants or was otherwise extensive.

### D.   Obstruction of Justice

U.S.S.G. § 3C1.1 provides for a 2-point enhancement if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice.  An example of obstructive conduct is "committing, suborning, or attempting to suborn perjury." U.S.S.G. 3C1.1, App. Note 4(b).  A witness commits perjury if he gives false testimony under oath or affirmation, "concerning a material matter, with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  "The sentencing judge need only find by a preponderance of the evidence that the defendant committed perjury."  *United States v. Armstrong*, 620 F.3d 1172, 1176 (9th Cir. 2010).

Defendant's testimony during a hearing to suppress his statements to agents was materially false on several occasions, and the defendant committed perjury.  At the suppression hearing, defendant testified, among other things, that law enforcement were displaying their guns, which he described as a "revolver" on the hip, and that they wore clothing with "FBI" written in large letters.

1  However, testimony from the agents in this case definitively
2  established that they were not carrying revolvers during the
3  interview of the defendant.  In fact, as noted during the hearing,
4  agents do not carry revolvers except potentially as a backup weapon.
5  Further, agents established that they wore civilian clothing that
6  day, and that they did not have any weapons visible in plain sight.
7  With just these few aspects of his testimony alone, defendant
8  demonstrated his willingness to make any statement under oath in
9  Court that could possibly suit his purpose.  But there was more.
10     Defendant stated that he was under the heavy influence of many
11 alcoholic drinks and various medications; that he was not free to
12 leave at the interview; and that he did not consent to an interview.
13 All of that testimony was contradicted by the agents' testimony or
14 otherwise did not add up.  Additionally, agents stated that during
15 the interview the defendant either made or received a phone call
16 after which he advised agents that he needed to leave.  However,
17 despite the account of two different agents on the stand, defendant
18 testified that there was no way he was on the phone because he did
19 not have cell service there.  Defendant's entire testimony regarding
20 his interview with agents was created without any regard for the
21 truth.
22     At trial, testifying in front of the jury, defendant fared no
23 better with truthfulness.  Defendant testified that numerous
24 signatures and "VB" initials, on documents related to supposed
25 deliveries of equipment, were not actually signed by him.  This
26 testimony was squarely contradicted by the documents themselves, as
27 well as other documents that defendant admitted had his signatures,
28

such as bank signature cards, which showed the same signatures as was placed on other delivery related documents that he denied had his signatures.

At trial, defendant also testified that he did not tell SA Li and SA Wong that he signed a specific delivery ticket that they had showed him (GX 18 at p. 7).  However, SAs Li and Wong testified at trial that defendant had stated during an interview that it was his signature on that delivery ticket (GX 18 at p. 7).

Defendant also testified that he did not make any deliveries in Fresno, and in fact has never been to Fresno.  However, delivery related documents, for beneficiaries who lived in Fresno, bear defendant's signatures (*see e.g.*, GX 18 at p. 7; GX 37 at pp. 9, 16), and the claims data indicates a significant percentage of defendant's business was for beneficiaries who lived in the Fresno area (*see* GX 13).  In fact, approximately 130 of Royal's beneficiaries were located in the Fresno area per SA Wong's testimony.

The weight of all the evidence shows that defendant provided perjured testimony at trial, and the 2-point enhancement should be applied under U.S.S.G. § 3C1.1.

**E.   Abuse of a Position of Trust**

The government agrees with the PSR that a two-point enhancement for abuse of position of trust should be applied pursuant to U.S.S.G. § 3B1.3.  The Ninth Circuit recently held that this adjustment can apply for medical equipment suppliers where they have the requisite "'professional or managerial discretion' . . . if they are responsible for determining the need for the equipment they provide

//

and personally certify the validity of their claims to Medicare." *United States v. Adebimpe*, 819 F.3d 1212, 1214 (9th Cir. 2016).

Per defendant's testimony and as indicated through government exhibits admitted at trial, defendant was the owner of Royal Medical Supply and was in charge of its operations. (*See* GX 6 at p. 27). As in *Adebimpe*, here, defendant certified that he would not submit fraudulent claims and that he would abide by Medicare laws and regulations. (*See* GX 4 at p. 33; *see also* GXs 2, 5, and 6). Also, testimony at trial of the Medicare witness, M.N., indicated that the DME supplier had a responsibility to independently determine the need for the equipment they provided and to ensure that the beneficiary meets the coverage criteria for the equipment. The DME provider was required, here, as in *Adebimpe*, to conduct their own home assessments to ensure that the power wheelchair could be accommodated and maneuvered within the beneficiaries' homes. Evidence at trial showed that many of these home assessments were also fraudulently created.

Ultimately, the defendant was the one who controlled and operated Royal Medical Supply and, as a supply company that billed and received money from Medicare, defendant was in a position of trust with respect to Medicare; a position of trust that he abused by submitting false claims to Medicare. *See, e.g., United States v. Miller*, 607 F.3d 144, 149 (5th Cir. 2010) (finding that abuse of trust enhancement applied because Medicare "rel[ies] not only on the truthfulness of physicians but also on the truthfulness of other vendors, including DME providers such as [defendant]").

//
//

**F. Government's Guidelines Calculations**

Given all of the above enhancements and adjustments, the government submits that the following is the defendant's appropriate total offense level and Guidelines Range:

| | | | |
|---|---|---|---|
| Base Offense Level | : | + 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Loss Amount (more than $1 million) | : | +16 | [U.S.S.G. § 2B1.1(b)(1)] |
| Abuse of Trust | : | + 2 | [U.S.S.G. § 3B1.3] |
| Aggravating Role | : | + 3 | [U.S.S.G. § 3B1.1(b)] |
| Obstruction of Justice | : | + 2 | [U.S.S.G. § 3C1.1] |

**Total Offense Level :    29**

The corresponding range of imprisonment for this offense level is 87-108 months.  Based upon the above Guidelines calculations and the factors set forth in 18 U.S.C. § 3553(a), the government submits that the Court should sentence defendant to 87 months in prison and three years of supervised release.

**IV. RESTITUTION**

The restitution amount in this case is the amount that Medicare paid based on the fraudulent billings during the course of the scheme.  As advanced by the PSR, the Court should require the defendant to pay the amount that was paid by Medicare pursuant to the fraudulent prescriptions associated with six referring physicians during the course of the fraud scheme, $1,266,860.03 (based on $1,822,130.50 billed).

Restitution is mandatory under the Mandatory Victims Restitution Act ("MVRA") because the defendant's crime involved fraud and deceit. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii); *United States v. Gordon*, 393 F.3d

1044, 1048 (9th Cir. 2004) ("The MVRA makes restitution mandatory for . . . offenses which involve fraud or deceit"; courts interpreting MVRA may look to and rely upon cases interpreting Victim and Witness Protection Act (VWPA) as precedent); *United States v. Mitrione*, 357 F.3d 712, 721-22 (7th Cir. 2004) (Medicare was a victim under MVRA and, therefore, sentencing court properly ordered defendants to pay restitution to Medicare); *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999) ("[O]nly when the crime of conviction involves a scheme, conspiracy or pattern of criminal activity . . . may the restitution order include acts of related conduct for which the defendant was not convicted"); *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997) (under VWPA, restitution may be ordered for losses to person harmed in the course of defendant's scheme even beyond counts of conviction).

## V. SENTENCING FACTORS – 18 U.S.C. § 3553(a)

### 1. Nature and Circumstances of the Offense

The nature and circumstances of the defendant's offense warrant sentencing him to a term of imprisonment of 87 months. Defendant committed a serious offense. Fraud schemes such as the one operated by the defendant target a federal program designed to provide medical care to some of the most vulnerable members of society - the aged and disabled. Although Medicare fraud is a serious problem nationwide, it is particularly acute in the Central District of California. *See Medicare Health Care Fraud & Abuse Efforts: Before Committee on the Budget*, U.S. H. of Rep., 108th Cong. (2007) (statement of Michael O. Leavitt, Sec. of U.S. Dept. of Health and Human Services). In fact, the Central District of California is second only to the Southern

District of Florida in the amount of Medicare funds lost each year to fraud schemes such as the one perpetrated by defendant. *Id.*

As the owner of Royal, defendant oversaw a multi-year, multi-million dollar fraud perpetrated against a vulnerable government program through the exploitation of elderly and infirm Medicare beneficiaries. The Medicare program is a trust-based system that relies on providers to submit true and accurate claims for reimbursement. By targeting the Medicare program, defendant wrongfully obtained money that could have been used to provide these valuable health care benefits to the elderly and disabled. These types of premeditated schemes pose a clear danger to the viability of the Medicare program.

**2. History and Characteristics of the Defendant**

The defendant chose to exploit his position as the owner of Royal. No one compelled the defendant to engage in Medicare fraud – he is responsible for the decisions that he made, motivated by greed, to engage in a scheme to commit health care fraud and defraud the Medicare program.

In addition, at trial the defendant testified and he lied about his conduct and knowledge to suit his purposes. As explained *supra*, his testimony contradicted the accounts provided by other witnesses and the documents in this case. Additionally, the defendant has not once accepted any responsibility for his role in the fraud scheme in this case.

//
//

   **3. Deterrence, Promoting Respect for the Law, Protecting the Public From the Defendant, and Punishing the Defendant for His Crimes**

Section 3553(a)(2) states that at sentencing, the court shall consider, among other things, the need for the sentence imposed -

   (a)    . . . to promote respect for the law, and provide just punishment for the offense . . .;

   (b)    to afford adequate deterrence to criminal conduct;
          [and]

   (c)    to protect the public from further crimes of the defendant . . . .

See 18 U.S.C. § 3553(a)(2).

   The Government's recommended sentence of 87 months reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the defendant's crimes.  The defendant devised a calculated scheme to defraud Medicare by submitting claims for equipment that beneficiaries did not medically need and in some cases never received.  In doing so, defendant even maintained fraudulent paperwork.  For example, many documents bearing the signatures of beneficiaries were not in fact signed by the beneficiaries, and other documents, such as required home assessments, were fraudulently created.  During the entire course of the scheme, the defendant submitted more than $4 million in claims to Medicare, and he was paid approximately $2.7 million on those claims.

   The United States submits that a sentence of 87 months in custody is also necessary to deter others from engaging in similar criminal activity.  Medicare fraud is rampant in the Central District of California.  This sentence is necessary to send a message to the

defendant and others that this District will not tolerate their conduct and will punish them accordingly if they continue to victimize both Medicare and the elderly and disabled Medicare beneficiaries in the community.

## VI.   CONCLUSION

For the foregoing reasons, this Court should apply the Guidelines calculations set forth in this sentencing memorandum, and find that the defendant has an offense level 29, for an advisory Guidelines range of 87-108 months imprisonment.  Based on this range, the government respectfully submits that, among other applicable fines and assessments, this Court should sentence defendant to a term of 87 months imprisonment, followed by a term of three years of supervised release, and order restitution payments of at least $1,266,860.03 to Medicare.  Such a sentence is necessary to punish the defendant for his conduct in this case and to afford adequate deterrence so that other individuals will not engage in similar brazen schemes to defraud the Medicare program.

Dated: September 23, 2016            Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


          /s/
RITESH SRIVASTAVA
CLAIRE YAN
Fraud Section, Criminal Division
U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA